IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:23-CR-00163 |
| v. | (Chief Judge Brann) |
| JEREMY PAULEY, | |
| Defendant. | |

MEMORANDUM OPINION

AUGUST 26, 2024

The issue presented by Defendant Jeremy Pauley's pending Motion in *Limine* is a narrow one: Whether United States Sentencing Guideline § 2B1.1(b)(1), which imposes sentence enhancements for basic economic offenses in accordance with the monetary loss of the victims of the offense, applies in this case. Resolution of Pauley's Motion will not decide his punishment or be the final word as to how the impact of Pauley's crimes on the victims will factor into that punishment. Regarding the latter, for the reasons explained herein, § 2B1.1(b)(1) will not factor into that analysis. As this Court has observed, "[t]he law does not always align with what one may believe is right, just, or fair."[1] While one might believe that a sentencing enhancement based upon the value of the stolen body parts is appropriate, that is not the law. Pauley's Motion is granted.

---

[1] *Reiner v. Northumberland Cnty.*, No. 4:24-CV-00493, 2024 WL 2216852, at *1 (M.D. Pa. May 15, 2024).

I.   **FACTUAL BACKGROUND**

During the relevant period, The University of Arkansas for Medical Sciences maintained an anatomy lab which received cadavers through an Anatomical Gift Program through which donors could gift their body after death to be used by UAMS for medical education and research.[2] Harvard Medical School similarly utilized donated human cadavers in the regular course of medical education, teaching, and research.[3] After use, donated cadavers were to be cremated and then returned to the schools or the donee's families for final disposition.[4]

Instead, Cedric Lodge, the manager of the Harvard Medical School morgue, and Candace Chapman Scott, an employee of a mortuary which contracted with UAMS, stole dissected portions of the donated cadavers.[5] Lodge and Scott then sold the remains, which included "bones, skulls, skin, dissected faces and heads, internal organs . . . including brains, lungs, and others, and whole stillborn corpses" to their co-conspirators, including Pauley.[6] Pauley then re-sold those human remains to buyers in various states, or traded those remains for other human remains.[7]

Katarina Maclean, who, along with Joshua Taylor, had been granted access to the Harvard morgue by Lodge for the purpose of choosing remains for purchase,

---

[2] Information, Doc. 1, at ¶ 13.
[3] *Id.* ¶ 21.
[4] *Id.* ¶¶ 14-15, 23.
[5] *Id.* ¶¶ 5-8, 32, 38.
[6] *Id.* ¶¶ 31-38.
[7] *Id.* ¶ 40.

engaged Pauley to "tan" human skin to create leather.[8] Scott frequently corresponded with Pauley, who in turn corresponded with Matthew Lampi, regarding the sale of various body parts that were available for sale.[9] Among them were the remains of a still-born baby boy, which Scott sold to Pauley for $300 rather than cremating and returning the cremains to the boy's mother.[10]

In its Presentence Report, the Probation Office conservatively estimated that Pauley had sent almost $60,000 to Taylor, Scott, and Maclean to purchase stolen human remains.[11] The Government's investigation revealed that Pauley's "expenditures," that is the amount he paid for human remains, reached nearly $472,000 over a multi-year period.[12] In an interview with the FBI, Pauley reported that he had earned approximately $180,000 selling human remains through the first half of 2022.[13]

## II. PROCEDURAL BACKGROUND

On September 7, 2023, this Court accepted Pauley's guilty plea to a two-count Information charging him with Conspiracy to Commit Interstate Transportation of Stolen Property in violation of 18 U.S.C. § 371 (Count I) and Interstate Transportation of Stolen Property in violation of 18 U.S.C. § 2314 (Count

---

[8] *Id.* ¶¶ 35, 42.
[9] *Id.* ¶¶ 47-101.
[10] *Id.* ¶¶ 83-86.
[11] Sealed Doc. 31, ¶ 44.
[12] Doc. 35, at 5.
[13] Doc. 35-1, at 2.

II).[14] Upon accepting Pauley's guilty plea, the Court ordered the United States Probation Office to conduct a presentence investigation and prepare a presentence report.[15] On January 19, 2024, the Probation Office filed its Draft Presentence Report.[16] After several extensions to the deadline to raise objections to the Presentence Report,[17] Pauley asked the Court to weigh in on a matter of statutory interpretation: Whether, and if so, to what extent, a sentencing enhancement is appropriate in this case under USSG § 2B1.1(b)(1).[18]

While the Government disagrees with Pauley's position that § 2B1.1(b)(1) is inapplicable, the Government concurred with Pauley's request for a pre-sentencing determination on the issue.[19] Accordingly, the Court requested that the parties brief Pauley's pending Motion in *Limine* and scheduled oral argument. In its Order setting a briefing and argument schedule, the Court instructed the parties to limit their discussion to the narrow issue presented by Pauley's Motion; argument and advocacy regarding other sentencing matters are to be presented as they would in the ordinary course.[20]

---

[14] Information, Doc. 1; Guilty Plea, Doc. 16.
[15] Doc. 18.
[16] Sealed Doc. 21.
[17] Docs. 22-28.
[18] Mot., Doc. 29.
[19] Certificate of Nonconcurrence, Doc. 29-1.
[20] June 12, 2024 Ord., Doc. 30. The Court also continued the deadline to object to the Presentence Report to a date to be determined following resolution of the pending Motion.

The parties filed their briefs and oral argument was held on August 6, 2024.[21] Pauley's Motion is ripe for disposition and, for the reasons below, it is granted.

## III. LEGAL STANDARD

Interpretation of the United States Sentencing Guidelines is guided by principles of administrative law.[22] In *Stinson v. United States*,[23] the United States Supreme Court held that, in interpreting the Guidelines, courts should give deference to the accompanying commentary "unless they are plainly erroneous or inconsistent" with the Guideline.[24] Following *Stinson* then, courts' interpretation of the Guidelines "was informed by the then-prevailing understanding of the deference"—so-called *Seminole Rock*[25] or *Auer*[26] deference—"that should be given to agency interpretations of their own regulations."[27]

In *Kisor v. Wilkie*, the Supreme Court "cut back on what had been understood to be uncritical and broad deference to agency interpretations and explained that *Auer*, or *Seminole Rock*, deference should only be applied when a regulation is genuinely ambiguous."[28] "*Kisor* instructs that 'a court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had

---

[21] Br. Supp., Doc. 34; Opp'n, Doc. 35; Reply, Doc. 36.
[22] *United States v. Nasir*, 17 F.4th 459, 469 (3d Cir. 2021) (*en banc*).
[23] 508 U.S. 36 (1993).
[24] *Nasir*, 17 F.4th at 470 (quoting *Stinson*, 508 U.S. at 44).
[25] 35 U.S. 410 (1945).
[26] 519 U.S. 452 (1997).
[27] *Nasir*, 17 F.4th at 470.
[28] *Id.* (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-15 (2019)).

no agency to fall back on. Doing so will resolve many seeming ambiguities out of the box, without resort to *Auer* deference.'"[29]

In *United States v. Nasir*,[30] the United States Court of Appeals for the Third Circuit "sat *en banc* and unanimously concluded that this reprised standard for *Auer* deference applied to the Sentencing Commission's interpretative commentary" of the sentencing Guidelines.[31] As Judge Bibas put it, "[i]n *Kisor*, the Supreme Court awoke us from our slumber of reflexive deference" to the commentary.[32]

Following *Kisor* and *Nasir*, "before concluding that a [sentencing Guideline] is genuinely ambiguous, a court must exhaust all the 'traditional rules' of construction."[33] "Unless the Guideline's text is ambiguous and the comment provides clarity, the text alone controls."[34] Further, pre-*Nasir* precedent "that had afforded *Auer* deference to the Commission's interpretive commentary without engaging in the *Kisor* process does not automatically retrain its controlling force."[35] When genuine ambiguity exists, a court must then "make an 'independent inquiry' into the 'character and context' of the reasonable interpretations" of the Guideline before affording deference to the commentary.[36]

---

[29] *Id.* (quoting *Kisor*, 139 S. Ct. at 2415).
[30] 17 F.4th 459 (3d Cir. 2021).
[31] *United States v. Banks*, 55 F.4th 246, 256 (3d Cir. 2022) (citing *Nasir*, 17 F.4th at 470-71).
[32] *Nasir*, 17 F.4th at 472 (Bibas, J., concurring).
[33] *Kisor*, 139 S. Ct. at 2415; *accord Nasir*, 17 F.4th at 470.
[34] *U.S. v. Chandler*, 104 F.4th 445, 450 (3d Cir. 2024) (citing *Nasir*, 17 F4th at 471).
[35] *United States v. Adair*, 38 F.4th 341, 350 (3d Cir. 2022).
[36] *Id.* (quoting *Kisor*, 139 S. Ct. at 2416).

## IV. DISCUSSION

United States Sentencing Guideline § 2B1.1 provides "a graduated scale based upon the monetary amount of loss"[37] and instructs "[i]f the loss exceeded $6,500, increase the offense level" in accordance with that scale.[38] At issue here is the meaning of the word "loss" as used in § 2B1.1. Pauley insists that the Guideline is unambiguous. He argues that, because "loss" includes only pecuniary losses and no victim suffered a pecuniary loss, the Guideline does not apply. The Government urges the Court to find ambiguity in § 2B1.1 and rely on the procedure outlined in the commentary for calculating the loss.

Evaluating the parties', in particular the Government's, arguments, one is reminded of the saying, "when the law is on your side, argue the law, when the facts are on your side, argue the facts, and when neither are on your side, pound on the table." The Government need not, of course, resort to table-pounding; the facts are unquestionably on its side. However, that the Government's brief is heavy on facts and light on caselaw highlights that the law is not. As explained below, whether the Court finds ambiguity in the Guideline or not, the outcome is the same: The loss suffered by the victims of Pauley's conduct does not fall within § 2B1.1.

---

[37] *Banks*, 55 F.4th at 257.
[38] USSG § 2B1.1(b)(1).

7

## A. Loss as Unambiguous

In *United States v. Banks*,[39] the Third Circuit, post-*Nasir*, examined the language at issue here, albeit in a different context, and held that it was not ambiguous. The defendant in *Banks* had been convicted of wire fraud in connection with an attempted scheme to make fraudulent deposits into investment accounts, and then withdraw funds before the lack of supporting funds could be detected.[40] The scheme was unsuccessful; the relevant financial institution never transferred a single dollar to the defendant and, as a result, suffered no actual loss. At sentencing, the District Court imposed an enhancement under § 2B1.1 on the basis that the Guideline included not only actual loss but intended loss as well. The Third Circuit reversed, concluding that "in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word 'loss' is the loss the victim actually suffered."[41]

Pauley insists that *Banks*' holding that the word "loss" as used in § 2B1.1 means "actual loss" dictates the outcome in this case.[42] The Government argues that *Banks* is distinguishable because it dealt with an attempted, but unsuccessful scheme whereas Pauley succeeded in enriching himself through the offense conduct.[43] Both

---

[39] 55 F.4th 246, 256 (3d Cir. 2022).
[40] *Id.* at 250-51.
[41] *Id.* at 258.
[42] Doc. 34, Section II.A.
[43] Doc. 35, at 7.

8

arguments miss the mark. The Court agrees with Pauley that *Banks*, which conducts an analysis of the same term at issue in this case, is instructive. However, *Banks* did not go so far as to explicitly decide the issue of what kinds of "actual losses" fall within the ambit of § 2B1.1. While the Government is correct that this case presents a different analysis than that in *Banks*, the inquiry at the core of both cases is the same: "the ordinary meaning of the word 'loss'" "in the context of a sentence enhancement for basic economic offenses."[44]

The Government suggests that, in conducting that inquiry, "this Court should find the term 'loss' presents a 'genuine ambiguity' in the context of this case."[45] However, the inquiry is whether "loss" presents a genuine ambiguity in the context of *the Guideline*, not in the context of the offense.[46] Reading *Banks* as the Government does would mean that the Third Circuit held only that "loss" meant "actual loss" in the context of the offense at issue in that case. But, as the Government agreed at oral argument, the meaning of the sentencing Guidelines is fixed—if the offense conduct does not fit the sentencing enhancement, then the enhancement does not apply.[47]

---

[44] *Banks*, 55 F.4th at 258.
[45] Doc. 35, at 17.
[46] *Banks*, 55 F.4th at 258.
[47] Arg. Tr. 22:5-14. The Government went on to argue that the enhancement *does* fit the crime, which is a different matter.

9

The Court begins, as instructed by *Nasir*, with the text of the Guideline which does not specifically define the term "loss." Because "loss" is not a term of art, it takes on its "ordinary, contemporary, common meaning."[48] To discern the common ordinary meaning of the word 'loss,' *Banks* began by looking to contemporary dictionaries.[49]

That brings the Court to the Government's next argument: Noting that *Banks* includes in the potential definitions of 'loss' "a person or thing or an amount that is lost"[50] and reasoning that the body parts at issue are either "a person or thing," the Government concludes that the victims of the theft of the body parts suffered a loss.[51] Just as is the case in determining the meaning of a word used in the Guideline, context matters. The context of the Third Circuit's reference to "a person or thing" as a potential definition of loss is a compilation of dictionary definitions of loss.[52] "[W]hile providing guidance, dictionaries do not create precedent."[53] Rather than simply inserting dictionary definitions into the Guidelines, the Court views those definitions in the context of the Guideline.[54] The *Banks* court did not need to decide "whether one clear meaning of the word 'loss' emerges broadly" because "[n]one of

---

[48] *Adair*, 38 F.4th at 350 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).
[49] *See id.* at 351; *Banks*, 55 F.4th at 257-58.
[50] *Banks*, 55 F.4th at 258.
[51] Doc. 35, at 14.,
[52] *Banks*, 55 F.4th at 257-58.
[53] *Chandler*, 104 F.4th at 451.
[54] *See Adair*, 38 F.4th at 351 (dictionary definitions remaining after "contextually inappropriate" definitions are excluded "provide a foundation" for the meaning of a term as used in the Guideline).

the[] definitions suggest an ordinary understanding that 'loss' means 'intended loss.'"[55] Therefore, it stopped short of determining what losses are included under § 2B1.1.

To answer that question, this Court picks up where *Banks* left off and considers the text, structure, and purpose of the Guideline to see "whether one clear meaning of the word 'loss' emerges."[56] As the Third Circuit observed, § 2B1.1 "provides a graduated scale based on the *monetary amount* of loss. As the victim's *monetary loss* grows, so too does the enhancement to the defendant's offense level."[57]

Further, § 2B1.1's text provides no guidance for "translat[ing] [non-monetary] losses to dollar values to apply the table in USSG § 2B1.1(b)(1)" as the Government suggests.[58] The Government, pointing to the commentary, offers that the Court simply determine the value of the stolen goods. This argument fails for three reasons.

*First*, the Government's reliance on the commentary's notes is misplaced. Because "we simply disregard the commentary" if the Guideline is unambiguous, the Court cannot look to the commentary for guidance on calculating a loss unless

---

[55] *Banks*, 55 F.4th at 258.
[56] *Id.*
[57] *Id.* at 257 (emphasis added).
[58] Doc. 35, at 8.

the Court first determines that the meaning of the word "loss" as used in § 2B1.1 is ambiguous.[59]

*Second*, while the value of the stolen goods will often closely approximate a theft victim's loss, value and loss are not the same thing, a distinction illustrated by another section of the Guidelines which incorporates the table in § 2B1.1.[60]

*Third*, in this case the value of the goods is determined, not by their value to the victims, but their value to Pauley. This conflates the victim's loss with Pauley's gain. Gain and loss are antonyms and, if the Sentencing Commission meant to devise an enhancement which increased an offense level based on the defendant's gain, it could have done so, just as it did in another subsection of § 2B1.1[61] or in another section of the Sentencing Guidelines which incorporates the table in § 2B1.1.[62]

The statements of the victims themselves confirm the unsuitability of § 2B1.1 for punishing the loss caused by Pauley. Several victims submitted to Probation a

---

[59] *U.S. v. Mercado*, 81 F.4th 352, 356 (3d Cir. 2023). *See also U.S. v. Sater*, No. 22-1621, 2023 WL 3734962, at *4 (3d Cir. May 31, 2023) ("[T]he commentary may only be consulted after a district court determines that the Guideline itself is genuinely ambiguous."); Arg. Tr. 28:12-25 (Government agreeing that the Court cannot look to the commentary to value the loss if the term loss is not ambiguous).
It could perhaps be argued that the lack of guidance regarding calculating a loss renders § 2B1.1 ambiguous. However, as discussed below, finding ambiguity in § 2B1.1 does not change the outcome.

[60] *See* USSG § 2B1.5(b)(1)(B) ("If the *value* of the cultural heritage resource or paleontological resource . . . exceeded $6,500, increase by the number of levels from the table in § 2B1.1.") (emphasis added).

[61] *See* USSG § 2B1.1(b)(17)(A) (applying a two-level enhancement if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense").

[62] *See* USSG § 2B1.4(b)(1) ("If the *gain* resulting from the offense exceeded $6,500, increase by the number of levels from the table in § 2B1.1.") (emphasis added).

"Declaration of Victim Losses." One victim requests restitution in the amount of one billion dollars on the basis that the "harm done is priceless."[63] The victim states that she suffered "no financial harm but the psychological harm is at times unbearable."[64] Multiple victims, similarly unable to quantify the monetary value of the harm they have suffered, simply put a question mark in the space for the amount of restitution they believe they are entitled.[65]

To accept the Government's position and answer those question marks with the amount of Pauley's profits would be to equate the loss suffered by the next of kin of the decedents with the value Pauley saw in the decedents' remains. The Court is unwilling to follow the Government down that path. Nor are Pauley's profits a reasonable estimation of any monetary loss suffered by the medical schools. The schools had no further economic interest in the remains which were stolen then bought and sold by Pauley and his coconspirators.

The Court also cannot overlook that, in *Banks*, the Third Circuit took for granted that "loss" as used in § 2B1.1 means monetary loss. When *Banks* "begin[s] with the plain text of § 2B1.1," it states that it "provides a graduated scale based on the monetary amount of loss. As the victim's monetary loss grows, so too does the

---

[63] Sealed Doc. 31, at 29.
[64] *Id. See also id.* at 63 (requesting $1 million in restitution on the basis that the "loss and distress" caused by Pauley is "unforgiveable"), 66 (requesting $1 million in restitution due to "mental anguish, loss of sleep, anxiety, sadness, inability to concentrate").
[65] *Id.* at 27, 28.

13

enhancement to the defendant's offense level[.]"⁶⁶ Observing that "in context, 'loss' could mean pecuniary or non-pecuniary loss and could mean actual or intended loss," the *Banks* court held that § 2B1.1 applied only to actual loss.⁶⁷ Read in context, this sentence does not suggest that, as the Government asserts, loss in the context of § 2B1.1 could mean pecuniary or non-pecuniary losses.⁶⁸ Rather, the best reading is that, while "loss could mean pecuniary or non-pecuniary loss and could mean actual or intended loss," in the context of § 2B1.1, just as loss only means pecuniary loss, it also only means actual loss. Thus, § 2B1.1's text and structure point to a meaning of loss that includes only monetary loss.

The Government insists that accepting Pauley's position "lead[s] to an absurd result[:] No matter how many or how few body parts Pauley and his coconspirators stole and sold, and no matter how many hundreds of thousands of dollars they profited from those thefts, the Guidelines range would never change."⁶⁹ That, the Government asserts, "simply cannot be correct, because it could lead to a defendant who stole a single body part and sold it for a small profit to face the same Guideline range" as a defendant who profited hundreds of thousands of dollars." It seems, then, that to limit "loss" to monetary loss would frustrate the Guideline's purpose of imposing harsher punishments for more serious offenses.

---

⁶⁶ *Banks*, 55 F.4th at 256.
⁶⁷ *Id.* at 258.
⁶⁸ Doc. 35, at 17.
⁶⁹ *Id.* at 13.

However, the same could be said of the holding in *Banks*. There, the defendant's scheme, if successful, would have resulted in a 12-level enhancement under § 2B1.1.[70] But, because the enhancement does not include intended losses, the Guideline range is the same for the defendant in *Banks* as for defendants who unsuccessfully attempt similar schemes on much smaller or larger scales. Whereas a defendant whose offense conduct results in an actual loss of more than $550,000,000 would receive a 30-level increase, a defendant who intended such a loss receives the same Guideline range as a defendant who intended only a nominal loss.[71] Insofar as the Guidelines fail to measure the relative culpability of such defendants, the solution is to vary or depart from the Guideline range as properly calculated within the confines of the law, not to depart from the law altogether.[72]

---

[70] *Banks*, 55 F.4th at 253.
[71] USSG § 2B1.1(b)(1).
[72] *See* 18 U.S.C. § 3553(a)(6) (instructing courts to consider, in addition to the calculated Guideline range, "the need to avoid unwarranted sentence disparities"); *Banks*, 58, F.4th at 258, n.58 ("Our holding should not be read as imposing any restriction on a district court's discretion to vary a sentence when appropriate."); *U.S. v. Khan*, No. 22-1906, 2023 WL 2609819, at *3 (3d Cir. Mar. 23, 2023) (affirming upward variance which "capture[d] the 'spirit' of [an] enhancement" that was justified on the facts of the case, despite the enhancement not applying on its face).
The Court notes that, in *Banks*, the Honorable Mark. R. Hornak imposed the same sentence on remand. Am. J., *United States v. Banks*, No. 2:15-CR-168, Doc. 1612 (W.D.Pa. May 2, 2023). Banks' appeal of that sentence is currently pending before the Third Circuit. *United States v. Banks*, No. 23-1832 (3d Cir.). Also, in *United States v. Fisher*, the Third Circuit affirmed a sentence where the district court "adopted the . . . incorrect definition of 'loss'" but also provided an "alternate ruling" that the defendant's "case would nonetheless 'clearly' warrant an upward departure." No. 22-1575, 2024 WL 277704, at *2 (3d Cir. Jan. 25, 2024).

The same considerations alleviate any concerns raised by the Government's hypothetical theft of rare artifacts from a museum or similar crimes.[73] The Government suggests that to accept Pauley's argument would be to hold that defendants in the hypothesized museum theft would not be subject to § 2B1.1. Assuming that the Government is correct, the sentencing court in such cases would still have the ability, if not the obligation, to consider the nature of the offense and vary or depart from the Guidelines as necessary.[74]

In accordance with the above, the Court concludes that, in the context of § 2B1.1, "loss" unambiguously means monetary, or pecuniary loss. Therefore, Pauley's motion will be granted, and his objection sustained.

### B. Loss as Ambiguous

Even if the Court concluded § 2B1.1 could be read differently—the word "loss" as used in the Guideline is ambiguous—it would not change the outcome.

Despite asking the Court to find ambiguity in § 2B1.1, the Government does not substantively discuss whether the commentary is "reasonable" as required by *Nasir* and its progeny.[75] In fact, the Government does not discuss the application notes which define loss as used in § 2B1.1(b)(1) at all.

---

[73] Doc. 35, at 9 n.1

[74] The hypothesized museum theft is not before the Court, so the Court need not resolve the issue it presents. Nevertheless, the Court notes that such offenses would likely result in readily identifiable pecuniary losses, such as insurance losses, losses of investment in the relevant stolen good, deceases in net worth, or losses of revenue.

[75] *Mercado*, 81 F.4th at 359 (citing *Banks*, 55 F.4th at 253; *Nasir*, 17 F.4th at 471).

The commentary defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."[76] It further defines "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money."[77] "Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm."[78] The Court finds that the commentary does not "improperly expand[] the Guideline"[79] and remains within "the outer bounds of permissible interpretation."[80] Also, as the Third Circuit has recognized, the Sentencing Commission is "'optimally positioned to opine' on criminal sentencing due to its 'expertise.'"[81] Therefore, the commentary's interpretation of "loss" is reasonable.

The Government does not meaningfully argue that any victim here suffered an actual, pecuniary loss as defined by the commentary. On the contrary, the Government concedes that the victims have not suffered a pecuniary loss.[82] Letters submitted to the Court by the victims confirm that the harm they have suffered is

---

[76] USSG § 2B1.1, Application Note 3(A)(i). The commentary first says that loss is the greater of the actual or intended loss. However, following *Banks*, even if the Court considers the commentary, loss is limited to only actual loss.
[77] USSG § 2B1.1, Application Note 3(A)(iii).
[78] *Id.*
[79] *Banks*, 55 F.4th at 253.
[80] *Nasir*, 17 F.4th at 471.
[81] *U.S. v. Chandler*, 104 F.4th 445, 455 (3d Cir. 2024) (quoting *Mercado*, 81 F.4th at 360). *See also Nasir*, 17 F.4th at 471 (otherwise reasonable interpretation of ambiguous Guideline entitled to controlling weight when it "in some way implicates [the Sentencing Commission's] substantive expertise").
[82] Arg. Tr. 5:17-19.

17

emotional and is not readily measurable in money.[83] The loss of trust in the medical schools, which has impacted its ability to secure donors to their Anatomical Gift Programs, also falls squarely within the commentary's exclusion of reputational harm from loss. As do costs the schools incurred "responding to search warrant[s] and subpoenas."[84] To the extent the schools have had to expend resources responding to civil lawsuits brought against them, those are expenses incurred responding to allegations that the *schools* are liable for the harm caused by the offense conduct.[85] Attributing that loss to Pauley would be inconsistent with the nature of those claims, which is that the schools themselves share responsibility for the harm done to the next of kin victims.[86]

Rather than engaging with the commentary's interpretation of § 2B1.1, the Government skips ahead to the Application Notes which provide direction as to calculating loss. That puts the cart before the horse; the Court must first determine

---

[83] *See, e.g.*, *supra* nn.63-64 (victim stating that she has suffered "no financial harm but the psychological harm is at times unbearable"); *supra* n.64 (requesting restitution for distress and mental anguish); *supra* n.65 (victims unable to quantify dollar value of loss); Doc. 31, at 70 (victim "urge[s] the court to consider the[] losses [suffered by the decedents' next-of-kin] to be far greater than any financial loss that resulted from Jeremy Pauley's actions"). The Court notes that certain victims claim that they have suffered lost wages and other financial harms flowing from their emotional distress. *E.g.*, Doc. 31, at 52. However, such harms are too attenuated to be said to have been "reasonably foreseeable pecuniary harm." USSG § 2B1.1, Application Note 3(A)(i).

[84] *See* Arg. Tr. 28:2-6 (Government arguing that expenses incurred by victims related to the criminal investigation constitutes loss); USSG § 2B1.1, Application Note 3(D)(ii) (excluding from loss "costs incurred by victims primarily to aid the government in the prosecution and criminal investigation of an offense).

[85] *Cf.* Arg. Tr. 28:6-8 (Government noting that the schools have had to respond to civil lawsuits).

[86] The Court emphasizes that the viability of such claims or the culpability of the schools and the businesses the schools contracted with are outside the scope of the matters before this Court.

18

there is a loss before attempting to calculate it.⁸⁷ As the United States Court of Appeals for the Tenth Circuit recently held in a similar case, "[t]he Government cannot short-circuit the loss calculation by using the gain that resulted from the offense without first attempting to prove actual loss in the first instance."⁸⁸

The Court can, and will, consider the impact of Pauley's offenses on the victims at sentencing. However, "the proper way to punish a defendant who causes *non-pecuniary*, but otherwise serious harm is to impose an upward departure," not by misconstruing or ignoring outright the Guideline's text and commentary as the Government (or defendant for that matter) sees fit.⁸⁹

## V. CONCLUSION

For the foregoing reasons, Pauley's Motion is granted and his objection to the imposition of an enhancement under USSG. § 2B1.1(b)(1) is sustained.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

⁸⁷ *See* USSG § 2B1.1, Application Note 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss *only if there is a loss* but it cannot be reasonably determined.") (emphasis added).

⁸⁸ *U.S. v. Hess*, 106 F.4th 1011, 1024 (10th Cir. 2024) (citations and quotations removed). *See also id.* at 1026 (holding, in another case centered on the improper sale of body parts, that "[t]hough we recognize that the next-of-kin victims have suffered emotional harms that may be redressable in another forum, the Sentencing Guidelines direct our focus to pecuniary harms").

⁸⁹ *U.S. v. Free*, 839 F.3d 308, 320-21 (3d Cir. 2016) (emphasis in original).